GEORGE D. OLIVER, ESQ. SBN 146321
LAW OFFICE OF GEORGE D. OLIVER
42 Hickory Road
Fairfax, CA 94930
San Rafael, CA.  94903
(415) 485-4430
(415) 485-1147
go@goliverlaw.com

Attorney for Plaintiff Mary Tagliaferri

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **MARY TAGLIAFERRI,** ) | **Case No 4:25-cv-02148-KAW** |
| ) | |
| **Plaintiffs,** ) | **THIRD AMENDED COMPLAINT FOR** |
| ) | **DAMAGES; BREACH OF CONTRACT** |
| **vs.** ) | **TO PAY A COVERED CLAIM;** |
| ) | **BREACH OF THE IMPLIED** |
| ) | **OBLIGATION OF GOOD FAITH AND** |
| **PALOMAR SPECIALTY INSURANCE COMPANY,** ) | **FAIR DEALING; INTENTIONAL** |
| **SEDGWICK CLAIMS MANAGEMENT SERVICES,** ) | **MISREPRESENTATION** |
| **DOES 1-99,** ) | |
| ) | **Judge: Hon. Kandis A. Westmore** |
| **Defendants.** | Complaint Filed: March 3, 2025 |
| | Trial Date: Not set |

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

(*Jury Trial Demanded*)

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A
COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR
DEALING; INTENTIONAL MISREPRESENTATION**

## I. PARTIES

1. Plaintiff MARY TAGLIAFERRI, M.D. ("Plaintiff") is an individual residing at 135 Terry Road, San Anselmo, California, 94960 and at all relevant times was employed as Chief Medical Officer for Nektar Therapeutics.

2. Defendant PALOMAR SPECIALTY INSURANCE COMPANY ("Palomar") is an insurance company authorized to transact business in California and issued the flood insurance policy at issue.

3. Defendant SEDGWICK CLAIMS MANAGEMENT SERVICES INC. ("Sedgwick") served as defendant Palomar's third-party administrator and exercised direct control over claim investigation, adjustment, communications, documentation, representations, and recommendations regarding payment of Plaintiff's claim.

4. Plaintiff is the beneficiary insured under a flood policy issued by Palomar covering the subject property, including Policy No. PPFLP-23-1487846-01 (the "Policy").

5. Defendants DOES 1-99 are individuals and/or entities whose true names and capacities are unknown.  Plaintiff will amend this Complaint when their identities are ascertained.

## II. JURISDICTION AND VENUE

6. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of the State of California and Defendant Palomar Specialty Insurance Company is a corporation organized and existing under the laws of the

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

State of Oregon with its principal place of business outside California. Jurisdiction is further proper pursuant to the forum-selection clause contained in the applicable insurance policy which mandates that any suit arising out of the policy or the handling of a claim be filed in the United States District Court for the district in which the insured's property is located.  This action arises from a **Private** Flood Insurance Policy, expressly defined in the subject policy as a "Private Flood Insurance Policy" issued by Palomar, a private stock insurer, and not a policy issued pursuant to the National Flood Insurance Program ("NFIP").

7.  Because this action arises from a private insurance contract rather than a Standard Flood Insurance Policy issued under the National Flood Insurance Act, state substantive law applies to Plaintiff's claims.

8.  Complete diversity exists between Plaintiff and Defendants.

9.  Venue is proper because the insured's property is located within the district and because the parties have contractually agreed to venue in this Court.

## III. NO FEDERAL PREEMPTION

10.  This action is not preempted by the National Flood Insurance Act of 1968 (42 U.S.C. Section 400 et seq) nor by the regulations governing the National Flood Insurance Program.  The insurance policy at issue is a private flood insurance policy, not a Standard Flood Insurance Policy issued pursuant to the NFIP.

11. This policy expressly defines itself as a Private Flood Insurance Policy issued by defendant Palomar Specialty Insurance Company, a private stock insurer, and not by

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

the Federal Emergency Management Agency ("FEMA"), or a Write-Your-Own ("WYO") carrier acting on behalf of the United States.

12. The subject Palomar Policy further confirms that flood insurance may be available under the NFIP as an alternative to the coverage issued by Palomar without federal backing, federal funds, or federal claims administration.  The policy was not issued pursuant to federal statute or regulation, does not incorporate NFIP claims-handling procedures, and does not designate FEMA or the United States as a real party in interest.

13. Although the policy contains a contractual forum-selection clause requiring that any lawsuit be filed in the United States District Court for the district in which the insured's property is located, that provision governs venue only and does not convert this private insurance contract into a federal policy or invoke federal preemption.

14. Because Plaintiff's claims arise from a private insurance contract, federal preemption does not apply, and all causes of action are governed by California substantive law.

## IV.  PALOMAR'S KNOWLEDGE, AGENCY AND RATIFICATION

15. Defendant Sedgwick acted as Palomar's agent in claim administration, investigation, evaluation, communications, and coverage recommendations and Palomar accepted the benefits of Sedgwick's conduct.

16. Defendant Palomar knew or should have known of Sedgwick's representations, omissions, delays and shifting "betterment/improvement" rationale and ratified that conduct by adopting Sedgwick's positions, failing to correct misrepresentations, and refusing to pay covered amounts.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

17. Plaintiff is informed and believes, and on that basis alleges, that all relevant times each defendant was the agent, servant, employee, and/or representative of each other defendant, acting within the scope of such agency and/or with later ratification, such that Defendants are responsible for the acts alleged herein.

## V. FACTUAL ALLEGATIONS

18. Plaintiff purchased the Property, a single-family-residence in or about 2018. The Property was originally constructed in or about 1976.

19. Plaintiff maintained a valid flood insurance policy issued by Palomar ("the Policy"), including coverage for building property and Flood Coverage E – Loss of Use.

20. On or about January 20, 2023m a severe rainstorm struck Northern California, causing heavy rainfall and flooding/water intrusion into the Property resulting in substantial damage.

21. On or about March 10, 2023, additional water intrusion and damage were discovered arising from the same underlying conditions.  Plaintiff contends that this was part of the same loss event, although Defendants treated it as a separate claim occurrence.

22. Plaintiff timely reported the loss and fully complied with all Policy conditions, including cooperation with inspections and documentation requests.

23. Plaintiff retained **GT Construction**, including contractor **Gordon Tindall**, to evaluate and perform necessary corrective repairs.

24. Plaintiff submitted detailed estimates for remedial/corrective repairs totaling $189,070.25 and demanded $50,000.00 for loss of use under Flood Coverage E.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

25. Palomar through Sedgwick has paid Plaintiff approximately $86,423.06 toward the claim but has denied further payment claiming the requested essential repairs are "betterment, improvements or upgrades," not covered under the Policy. However, these terms are not used as operative exclusions within the language of the Policy.

26. Plaintiff as of April 2026 has paid out of pocket to finish the project. The total cost of the project is now $267,214.01. Subtracting the amount paid by Palomar, Plaintiff is out of pocket $180,790.95 plus $50,000.00 for loss of use.

27. Between **January 2023 and mid-2024**, Plaintiff and her contractor explained and justified the corrective scope of repairs through **more than fifteen separate communications**, including onsite inspections, telephone conferences, written estimates, expert validation, and itemized documentation.

28. Sedgwick field adjuster **John Weber** inspected the Property on at least **three occasions** and repeatedly failed to timely identify any specific non-corrective or excluded line items.

29. On or about January 30, 2023, Sedgwick and Palomar conducted an onsite inspection attended by Plaintiff and Plaintiff's contractor Gordon Tindall of GT Construction. Sedgwick was represented by field adjuster John Weber.

30. During a January 30, 2023, inspection, GT construction representative Gordon Tindall explained and justified corrective repairs as essential to remediate flood damage and to stop the ongoing water intrusion.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

31. John Weber did not on January 30, 2023, or anytime thereafter disputed the necessity, legitimacy, or flood related nature of the proposed corrective repairs. John Webber promised a line-by-line coverage review and advance identification of any non-reimbursable items with Policy citations.

32. Plaintiff repeatedly requested such analysis in writing on February 6, 2023, March 2, 2023, and April 12, 2023. She never received them.

33. On or about March 27, 2023, John Weber returned for a second inspection with Plaintiff and contractor, Gordon Tindall.

34. Contractor Gordon Tindall once again reiterated the need for the corrective repairs. John Weber of Sedgwick again failed to raise any objection, concern or reservation regarding the proposed essential repairs needed. John Webber did not raise the issued of betterment or exclusions under the Policy.

35. Plaintiff and her contractor believed that funding would be shortly provided to continue with the corrective repairs.  When the funding failed to come, Plaintiff on April 25, 2023, transmitted a written email to John Weber and to Corporate memorializing the prior inspections and repeating the justification for the estimates for the needed repairs.

36. After no response, Plaintiff on May 15, 2023, escalated concerns by text and/or written communication regarding the mishandling, delay, and lack of transparency on the part of Sedgwick and Palomar.

7 | P a g e

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

37. Two days later, on May 17, 2023, Plaintiff had a phone call with John Webber to review GT Construction's estimate. Again, Weber failed to provide concerns with the scope or costs of the repairs identified.

38. On May 20, 2023, after not getting a response as to when the money would come to finish the project, Plaintiff emailed John Webber and other Palomar/Sedgwick personnel including Hal Schuman, Christian Herrera, Flo Harder, and Duncan McClaren detailing major concerns regarding the delayed reimbursement and handling of her claim.

39. On June 2, 2023, Plaintiff again emailed the same group advising partial reimbursement was insufficient and that she would not sign a release of settlement.

40. On June 30, 2023, Plaintiff retained Onne Broek an independent/contractor engineering consultant for an independent assessment as to the reasonableness of the needed repairs.

41. On November 22, 2023, John Weber returned for a third site visit with Plaintiff and contractor Gordon Tindall. Plaintiff and Weber reviewed in writing, on a white board, different payment options: 1. Prompt payments for costs as they were incurred or 2. Full payment of GT Construction's current estimate plus a final payment for any unpaid work. Weber agreed with Tagliaferri that one of the two payment options would be implemented. During the meeting, Sedwick's adjuster, Hal Shuman, was contacted by cell phone while Tagliaferri, Weber and Gordon Tindall were on speaker phone. The details of the meeting were communicated to Hal Shuman via

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

voicemail with a request for Hal Shuman to call Plaintiff back. Plaintiff was informed that Hal Shuman had the authority to pay the outstanding claim to finish the project. However, Hal Shuman never returned Plaintiff's call.

42. Plaintiff requested prompt payment and proposed payment as-you-go reimbursements per invoice or an upfront payment for the estimated total. Defendant John Weber and Sedgwick and Palomar failed to provide a clear written response.

43. On or about November 28, 2023, Plaintiff again sent a detailed request for prompt payment and notified John Weber that reimbursement was necessary to complete the job prior to further damage as the rainy season was beginning in Northern California.

44. On or about January 13, 2024, Engineering consultant Onne Broek issued a report confirming GT Constructions proposed repairs and itemized costs were appropriate and reasonable.

45. On or about January 17, 2024, because Sedgwick adjuster Hal Shuman never called back from the November 22, 2023, site visit where she was informed adjuster Hal Schuman had authority to finish paying the claim, Plaintiff was advised to and spoke with Robert Sargent regarding her claim including discussion about the repair estimates and payment issues.

46. Around the same time in January 2024, Plaintiff submitted a comprehensive repair estimate prepared by her contractor and provide it to Sedgwick and Palomar representatives.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

47. On or about March 6, 2024, John Weber sent an email approving the release of an additional $45,795.36 for an updated Palomar payment totaling $82,433.92. The Plaintiff informed Mr. Weber that she was still owed $161,433.92 and demanded payment. Later, around 1:02 PM, Mary sent a comprehensive email summarizing the history of the claim. At around 1:42 PM, Plaintiff confirmed her acceptance of a partial payment of roughly **$45,000** and indicated that a meeting between John Weber and contractor Gordon Tindall would follow to review the repair estimates further.

48. At approximately 2:05 PM, March 6, 2024 John Weber followed up after a phone call with Gordon Tindall, reiterating the next steps and emphasizing that he would incorporate his findings into an upcoming report.  Shortly after, at about 1:48 PM, Robert Sargent sent a brief acknowledgment thanking Mary for her communication.

49. On March 6, 2024, Defendants in their discussions with Plaintiff and her contractor Gordon Tindall failed to disclose any "betterment" or exclusion positions during these communications.

50. Plaintiff reasonably relied on these approvals and representations that she would be reimbursed for any out of pocket costs paid to continue the remedial repairs and continued to fund the repairs from her personal bank account and by selling shares of stock.

51. On March 11, 2024 John Weber sent an email at 2:22 PM requesting that contractor Gordon Tindall call him to discuss the details of the repairs and the cost submittals.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

This request was part of the ongoing efforts to reconcile the repair estimates and ensure all parties were aligned.

52. On March 12, 2024, Plaintiff provided Gordon's cell number to John Weber. This email helped facilitate direct communication between the adjuster and the contractor for further clarifications regarding the repair estimates.

53. On March 13, 2024, John Weber sent an email stating that he had spoken with contractor Gordon Tindall to review further details of the repair costs and that he would include his findings in a forthcoming report to the claims handler. Later that day, Plaintiff forwarded additional documentation—specifically a letter and the consultant's CV—to John Weber, reinforcing her position and providing further evidence to support her repair estimate. Other messages on this day confirmed that the executed Partial Proof of Loss had been located and that payment had been requested, indicating progress in the claim's settlement process.

54. On or about On or about May 3, 2024, communications were exchanged between Plaintiff, R. Fachon Reed, and others regarding the claim. In these emails, the newly assigned adjuster (Reed) noted that she had begun a preliminary review of Mary's contractor's estimate and that she was the examiner making recommendations for coverage and instructed Plaintiff to direct payment/coverage inquiries to Reed.  Ms. Reed also informed Plaintiff that John Weber was just a field adjuster versus the examiner who makes coverage recommendations. Simultaneously, Mary reiterated

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

her longstanding frustration by detailing the payment history and outstanding balances, and she emphasized her demand for payment.

55. On or about May 15, 2024, Plaintiff sent a strongly worded email giving Sedwick a 30-day deadline to provide full payment for the repairs. In her message, she warned that if the payment was not received within that timeframe, she would initiate legal proceedings for lack of good faith—and she also stated that she would seek recovery for her loss of use and her time at a rate of $500 per hour.

56. On June 6, 2024, Plaintiff sent an email documenting a recent phone call. In her message, she expressed her frustration at not being informed about a call between John Weber and an unnamed third party (who had spoken directly with her contractor, Gordon Tindall). Mary requested the name and title of that individual, and she also reiterated the need for John Weber to provide a detailed list of the repairs he deemed non-reimbursable. This communication underscores her concerns about transparency and the delays in moving forward with repairs.

57. On June 19, 2024, Plaintiff sent an email requesting the address for process service for a legal complaint. This request reflects her escalating frustration with the unresolved issues and ongoing delays in the claim settlement.

58. On June 20, 2024 the new adjuster, Reed sent an email noting that certain information (regarding lawsuit requirements) could be found in the policy (page 27), and he outlined the conditions under which a lawsuit could be filed against the insurer. Shortly after, at 7:03 AM, Mary sent another email in which she questioned whether

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

the estimated repairs would be covered by her policy, emphasizing that the estimates had been sent to the insurer approximately six months earlier. This email further stressed the urgency of resolving the outstanding payment issue, as delays had increased her loss of use claim.

59. On July 5, 2024, the new adjuster Mr. Reed sent an email to Mary outlining details of the coverage decision. In this message, he noted that her policy dictated a $2,000 deductible for both building and personal property, and he mentioned an instance of overpayment related to the building property damage. He wrote: "Your policy affords coverage to return damaged property to its pre-damaged state; it does not allow for improvements."  This was the first mention that the Policy did not allow for improvements.

60. On July 6, 2024, Plaintiff sent an email to Reed (and others) requesting detailed contact information (name, title, and dates of involvement) for every individual at Palomar and Sedwick who had been involved in her claim. This request aimed to ensure full transparency regarding who had reviewed her case.

61. On July 26, 2024, Flo Harder, Palomar's claims relationship specialist, reached out via email. He introduced himself and expressed his interest in discussing Mary's concerns about her claim with both the handling adjuster and his manager.

62. On July 30, 2024, Plaintiff sent an email providing several time slots (ranging from early morning to late afternoon) on the following days. In this email, she offered her availability for a call with the handling adjuster and manager to discuss her claim in

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

further detail. On this date, Flo Harder, Palomar claims relationship specialist acknowledged the difference between the GT Construction estimate and Sedgwick's estimate. Ms. Harder informed plaintiff that betterment would not be reimbursed and that she needed supporting documentation to support any code upgrade requirements.

63. On August 6, 2024, Palomar Vice President Teresa Urban formally asserted a "betterment" denial.

64. This rationale was advanced only after Plaintiff incurred substantial costs and after Defendants approved additional payment in March 2024.

65. Reed falsely minimized claim participants and asserted inability to identify prior involvement. These statements were misleading, as Sedgwick controlled a centralized claim file and knew or should have known who was assigned to work on the subject claim.

66. Defendants concealed the names of claim-file participants and decision makers after numerous requests by Plaintiff throughout 2023 and 2024 for information regarding their identify was material and intended to hinder Plaintiff's ability to dispute Defendants' later "betterment/improvement" narrative.

67. The Policy provides for Loss of Use up to $50,000.00 and even though Plaintiff provided documentation supporting her loss of use, Defendants failed to pay.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

68. Defendants' conduct left Plaintiff living in an unfinished construction zone for an extended period causing Plaintiff to suffer severe distress, anxiety, sleep deprivation, and loss of enjoyment of life.

69. The stringing on of misrepresentations and concealment of material facts by Palomar and Sedgwick representatives, John Webber, Hal Schulman, Robert Seargant, R. Fachon Reed, Flo Harder, and Palomar Vice President Teresa Urban made Plaintiff believe that she would ultimately be paid for out of pocket costs to front the corrective repairs necessary to stop the infestation and destruction and displacement of her property.  Defendants' conduct forced Plaintiff to liquidate assets and incur tax consequences to fund the project.

70. On July 5, 2024, Reed asserted for the first time that the Policy did not allow "improvements." On July 30, 2024, Palomar representative Flo Harder referenced "corrective repairs and betterment." On August 6, 2024, Palomar Vice President Teresa Urban formally asserted a "betterment" denial stating: The improvements and betterment that your contractor has listed and that you opted to have done were not covered under your policy." Urban then requested code upgrade information.

71. Defendants stated basis-improvements, betterment, was applied as a retroactive justification after months of assurances and silence, despite Plaintiff and her contractor's repeated requests for a line-by-line coverage determination and Policy citations all before she incurred the costs.

72. This rationale was advanced only after Plaintiff incurred substantial costs and after Defendants approved the March 2024 additional payment of $45,000.00.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

73. Because of the above representations and concealment of material facts Plaintiff falsely believed that she would be paid in full.

74. Defendants have repeatedly failed to provide the precise Policy provisions supporting their "betterment/improvement" rationale and failed to provide the promised line denial positions with citations.

75. The Policy provides building property coverage settled at replacement cost without deduction for depreciation and obligates payment of the necessary amount to repair or replace the damaged building (subject to the Policy terms).

76. The Policy further includes Flood Coverage E-Loss of Use, which provides that if a covered flood loss makes the dwelling unfit to live in, the Policy will pay up to $50,000.00 on an aggregate per-loss basis for covered loss-of-use categories.

77. Plaintiff has provided the requisite financial information and documentation supporting her loss of use for extended periods, including loss of use of material portions of the home. Defendants ignored Plaintiff's claim for loss of use failing to pay loss-of-use benefits under the terms of the Policy.

78. Defendants' misrepresentations, delays, and shifting positions left Plaintiff living for an unfinished construction zone and without the intended peace of mind flood insurance is meant to provide.

79. Plaintiff suffered severe distress, anxiety, sleep deprivation, and loss of enjoyment of life due to the prolonged inability to restore the home to safe, normal use, including impacts on family living arrangements and prolonged loss of functional bedroom/bathrooms. The damaged areas and ongoing conditions contributed to

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

additional harm, including infestation of rodents requiring rodent control and the displacement/storage of personal property that was damaged or destroyed.

80. Plaintiff's reliance on the actions and statements of Palomar and Sedgwick employees be paid for out of pocket costs to front the corrective repairs necessary to stop the infestation and destruction and displacement of her property. This reliance caused her to suffer further mental anguish as she was forced to live in this infested unfished construction zone pending what she believed would be full reimbursement for her claim.

81. Ultimately, Plaintiff had to pay out-of-pocket to finish the necessary repairs to have a livable dwelling causing her further mental anguish as she liquidated family assets and bank accounts. Plaintiff's mental anguish was exacerbated by the reliance on the statements of John Webber, Hal Schulman, Robert Seargant, R. Fachon Reed, Flo Harder, and Palomar Vice President Teresa Urban, who led Plaintiff believe that she would be paid in full for her claim and by the concealment by the above employees that Palomar through Sedgwick had no intention of ever paying Plaintiff the full amount of her claim.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Breach of Contract – Against Palomar Only)**

82. Plaintiff realleges paragraphs 1-81.

83. A contract of insurance existed between Plaintiff and Palomar (the Policy). Plaintiff performed all conditions of the Policy or was excused from performance.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

84. Palomar breached the Policy by failing to pay all covered benefits owed, including but not limited to: (a) covered corrective repairs necessary to restore the Property, and (b) covered loss-of-use up to the Policy Limits.

85. As a direct and proximate result of Palomar's breach, Plaintiff suffered damages including unpaid benefits, consequential damages and interes.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against Palomar Only)**

86. Plaintiff realleges and incorporates paragraphs 1-85 as though fully set forth herein.

87. Palomar, through Sedgwick unreasonably delayed, obstructed, misrepresented and mishandled the claim by fostering the false impression that essential corrective repairs would be covered while intentionally delaying and concealing its true reimbursement position and later invoking a "betterment/improvement" rationale without transparent line item analysis and Policy citations.

88. Palomar's conduct deprived Plaintiff of the benefits of the Policy and caused foreseeable harm including increased costs, prolonged loss of use and severe distress.

**THIRD CAUSE OF ACTION**

**(Intentional Misrepresentation and Concealment – Against Palomar Specialty Insurance Company and Sedgwick Claims Management Services Inc.)**

89. Plaintiff realleges and incorporates by reference paragraphs 1 through 88 as though fully set forth herein.

**A. Parties, Agency, and Identity of Persons Making the Misrepresentations (WHO)**

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

90. At all relevant times, Defendant Sedgwick Claims Management Services Inc. ("Sedgwick") acted as the authorized claims administrator, adjuster, investigator, and agent for Defendant Palomar Specialty Insurance Company ("Palomar"), exercising direct control over claim investigation, claim communications, coverage analysis, adjustment recommendations, repair evaluations, and payment recommendations regarding Plaintiff's flood insurance claim.

91. The misrepresentations, omissions, concealments, half-truths, and deceptive statements alleged herein were made by Sedgwick and Palomar employees, agents, representatives, and claims personnel including, but not limited to:

a.  John Weber, Sedgwick field adjuster;

b.  Robert Seargant, field adjuster for Sedgwick;

b. Hal Shuman, Sedgwick adjuster and supervisory claims representative;

c. R. Fachon Reed, Sedgwick examiner responsible for coverage recommendations and claim handling decisions;

d. Flo Harder, claims relationship specialist acting on behalf of Palomar; and

e. Teresa Urban, Vice President of Property Claims for Palomar.

92. At all relevant times, each of the above individuals acted within the course and scope of their employment and agency on behalf of Palomar and Sedgwick, and Palomar ratified and adopted their conduct, statements, omissions, coverage positions, and claim handling activities.

**B. Specific Misrepresentations and Concealments (WHAT)**

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

93. Beginning on or about January 30, 2023, and continuing through at least March 2024, Defendants, through their adjusters and representatives, affirmatively represented to Plaintiff that:

a. The corrective flood-related repairs necessary to stop ongoing water intrusion and remediate the Property would be reviewed line-by-line for coverage;

b. Plaintiff would be advised in advance of any repair items Defendants contended were not covered;

c. Defendants would provide policy citations and specific reasons for any line-item denial or limitation;

d. The repairs proposed by Plaintiff and contractor Gordon Tindall of GT Construction were being reviewed as necessary corrective repairs associated with the covered flood loss;

e. Plaintiff's repair estimates and supporting documentation were being evaluated for reimbursement;

f. Payment for the corrective repairs would be forthcoming subject only to completion of the promised review process; and

g. Defendants would work with Plaintiff to complete payment of the flood loss claim.

94. During the January 30, 2023, onsite inspection at Plaintiff's property, contractor Gordon Tindall explained in detail the corrective repairs necessary to remediate flood damage and prevent ongoing water intrusion. During that inspection, Sedgwick adjuster John Weber did not dispute the flood-related nature or necessity of the proposed repairs and expressly represented that Defendants would conduct a line-by-

20 | P a g e

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

line review and identify any allegedly non-covered items with supporting policy citations.

95. During the March 27, 2023, second onsite inspection, Plaintiff and contractor Gordon Tindall again reviewed the necessary corrective repairs with John Weber. Weber again failed to disclose any contention that the proposed repairs constituted non-covered "betterment," "improvements," or upgrades, and again failed to identify any allegedly excluded line items.

96. During a May 17, 2023, telephone conference regarding GT Construction's estimate, Weber again reviewed the scope and cost of repairs but failed to disclose that Defendants intended to deny substantial portions of the repairs as alleged "betterment" or "improvements."

97. During the November 22, 2023, onsite inspection at Plaintiff's property, Plaintiff, contractor Gordon Tindall, and John Weber discussed two proposed payment options for completing the repair project, including:

a. Prompt reimbursement payments as costs were incurred; or

b. Immediate payment of GT Construction's estimate with final reconciliation upon project completion.

98. During that November 22, 2023, meeting, Weber represented that one of the payment options would be implemented, and Plaintiff was informed that Sedgwick adjuster Hal Shuman possessed authority to approve and pay the outstanding claim balance necessary to complete the project.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

99. On March 6, 2024, Defendants approved an additional payment of approximately $45,795.36 and continued negotiations and communications regarding the repair estimates, including further discussions with contractor Gordon Tindall regarding repair scope, cost reconciliation, and continuing payment issues.

100. During the March 2024 communications and payment approvals, Defendants failed to disclose that they intended to deny substantial portions of the repairs as "betterment" or "improvements," despite knowing Plaintiff was continuing to fund repairs out of pocket in reliance on Defendants' prior representations and ongoing payment discussions.

101. Defendants further concealed and omitted material facts from Plaintiff, including:

a. That Defendants had already determined, or were in the process of determining, that they would deny substantial portions of the corrective repair work as alleged "betterment" or "improvements";

b. That Defendants did not intend to provide the promised advance line-by-line coverage analysis before Plaintiff incurred substantial repair expenses;

c. That Defendants intended to delay disclosure of their true reimbursement position until after Plaintiff substantially completed and funded the repairs;

d. That Defendants intended to use "betterment" and "improvement" terminology as a post-hoc justification for nonpayment after Plaintiff lost bargaining leverage;

e. That Defendants had no intention of timely providing the promised written policy-based denial analysis repeatedly requested by Plaintiff; and

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

f. That Defendants were maintaining centralized claim file information identifying claim participants, positions, and coverage determinations while simultaneously concealing or minimizing such information when requested by Plaintiff.

102.    Defendants did not expressly disclose their alleged "betterment/improvement" coverage position until July 5, 2024, when examiner R. Fachon Reed stated for the first time that the policy did not permit "improvements." Additional "betterment" positions were later asserted by Flo Harder on July 30, 2024, and formally asserted by Palomar Vice President Teresa Urban on August 6, 2024.

**C. Time, Place, and Manner of the Misrepresentations (WHEN / WHERE / HOW)**

103.    The misrepresentations, concealments, omissions, and deceptive conduct occurred:

a. During onsite inspections at Plaintiff's residence located at 135 Terry Road, San Anselmo, California, including inspections on January 30, 2023, March 27, 2023, and November 22, 2023;

b. During telephone conferences and speakerphone discussions between Plaintiff, contractor Gordon Tindall, and Sedgwick and Palomar representatives;

c. Through emails, text messages, written communications, and claim correspondence between February 2023 and August 2024;

d. Through repeated failures to respond to Plaintiff's written requests for line-by-line coverage determinations and policy citations; and

e. Through continuing payment negotiations and partial payment approvals while concealing Defendants' alleged intention to deny substantial portions of the claim.

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

104.    Plaintiff repeatedly requested written coverage clarification and line-by-line determinations on February 6, 2023, March 2, 2023, April 12, 2023, June 6, 2024, and on numerous other occasions, but Defendants failed to provide the promised analysis while continuing to foster the impression that payment for corrective repairs would ultimately be made.

**D. Knowledge of Falsity and Present Intent Not to Perform (SCIENTER)**

105.    At the time Defendants made the above representations and promises, Defendants knew the representations were false or made them recklessly and without regard for their truth.

106.    At the time Defendants promised to provide advance line-by-line coverage determinations and identify allegedly non-covered repair items, Defendants had no present intention of performing those promises.

107.    Specifically, Defendants:

a. Had no intention of timely providing the promised line-by-line coverage analysis before Plaintiff incurred substantial costs;

b. Intended to delay disclosure of their reimbursement position until after Plaintiff had substantially completed or funded the repairs;

c. Intended to continue encouraging Plaintiff to proceed with repairs necessary to mitigate additional damage while withholding their true coverage position;

d. Intended to later characterize the necessary corrective flood-related repairs as non-covered "betterment" or "improvements" after Plaintiff incurred irreversible costs; and

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

e. Intended to conceal material claim handling information and prior claim positions to hinder Plaintiff's ability to challenge Defendants' evolving coverage rationale.

108.     Defendants' fraudulent intent and lack of intent to perform are evidenced by, among other things:

a. Defendants' repeated promises to provide line-by-line coverage determinations coupled with their complete failure to ever provide the promised analysis;

b. Defendants' silence regarding any alleged "betterment" issue throughout the critical repair and payment period;

c. Defendants' continued negotiations, inspections, estimate reviews, and payment approvals while Plaintiff continued funding repairs;

d. Defendants' failure to identify any allegedly non-covered items during repeated site inspections and communications;

e. The fact that the "betterment" rationale was not disclosed until after Plaintiff incurred substantial out-of-pocket costs and completed significant repairs;

f. Defendants' control over a centralized claim file and knowledge of prior claim handling positions despite later minimizing or concealing such information; and

g. Defendants' shifting and evolving explanations for nonpayment.

### E. Intent to Induce Reliance

109.     Defendants made the foregoing representations, omissions, and concealments with the intent to induce Plaintiff to:

a. Continue time-sensitive corrective repairs necessary to prevent additional flood and water damage;

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

b. Personally fund the repair project out of pocket;

c. Continue relying upon Defendants' promises of payment and reimbursement;

d. Refrain from pursuing alternative legal remedies or financing options sooner; and

e. Lose bargaining leverage before Defendants disclosed their true coverage position.

110.    Defendants knew Plaintiff was contractually obligated to mitigate further property damage and knew Plaintiff would reasonably rely upon Defendants' superior knowledge regarding claim handling, policy interpretation, and coverage determinations.

**F. Justifiable Reliance**

111.    Plaintiff reasonably and justifiably relied upon Defendants' representations, omissions, and concealment of material facts.

112.    In reliance on Defendants' conduct, Plaintiff:

a. Proceeded with extensive corrective repairs to remediate flood damage and ongoing water intrusion;

b. Continued construction and remediation work believing reimbursement would be forthcoming;

c. Paid contractors and repair expenses out of her own personal funds;

d. Liquidated shares of stock and family assets to fund the repair project;

e. Utilized personal bank accounts and incurred significant financial losses and tax consequences. Plaintiff paid out-of- pocket $244,899.63 and was reimbursed for just $86, 423.06. Plaintiff's current outstanding amount paid and not reimbursed is $158,476.57 to finish the project;

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

f. Forewent alternative financing, mitigation, settlement, and litigation options she otherwise would have pursued had Defendants disclosed their true position earlier; and

g. Continued living in an unfinished and damaged construction environment while awaiting reimbursement.

113.    Plaintiff's reliance was reasonable because:

a. Defendants repeatedly represented that corrective repairs would be reviewed and reimbursed;

b. Defendants possessed exclusive control over coverage determinations and claim handling information;

c. Plaintiff repeatedly requested clarification and was never informed during the critical repair period that the repairs would later be denied as "betterment" or "improvements";

d. Defendants approved additional payments and continued negotiations during the repair process;

e. Plaintiff was under a continuing obligation to mitigate further flood-related damage; and

f. Plaintiff reasonably believed Defendants were acting in good faith and honestly communicating their coverage position.

**G. Resulting Damages**

114.    As a direct and proximate result of Defendants' intentional misrepresentations, concealment, omissions, and fraudulent conduct, Plaintiff suffered substantial damages including, but not limited to:

a. Out-of-pocket repair and remediation expenses exceeding $180,000;

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

b. Loss of use damages under the policy;

c. Liquidation of stock and assets;

d. Tax consequences associated with liquidation of assets;

e. Increased construction and remediation costs;

f. Extended inability to fully use and occupy the Property;

g. Emotional distress, anxiety, mental anguish, sleep deprivation, and loss of enjoyment of life;

h. Costs associated with displacement, storage, infestation, and unsafe living conditions; and

i. Other consequential and incidental damages according to proof.

**H. Palomar's Liability**

115.    Palomar is liable for the acts, omissions, and fraudulent conduct of Sedgwick and the individual adjusters and representatives under principles of agency, ratification, respondeat superior, adoption of claim handling conduct, and acceptance of the benefits of Sedgwick's claim administration activities.

116.    Palomar knew of, approved, ratified, adopted, or consciously disregarded Sedgwick's conduct, including the concealment of Defendants' true coverage position, the failure to provide promised coverage determinations, and the later assertion of the "betterment/improvement" rationale after Plaintiff incurred substantial repair costs.

**VII.    PRAYER FOR RELIEF**

117.    Plaintiff prays for judgement as follows:

28 | P a g e

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**

118.    Plaintiff seeks compensatory damages, including unpaid policy benefits;

119.    Plaintiff seeks consequential damages according to proof;

120.    Plaintiff seeks restitution and disgorgement as allowed by law;

121.    Plaintiff seeks injunctive relief as the Court deems appropriate;

122.    Plaintiff seeks pre-judgment and post-judgment interest as allowed by law;

123.    Plaintiff seeks an award of costs and attorney fees as allowed by law and or Public Policy.

124.    Plaintiff seeks such other and further relief as the Court deems just and proper.

Dated: May 6, 2026                    /s/*George D. Oliver*
                                      George Oliver, Esq.
                                      Kenneth Coren , Esq.
                                      Attorneys for Plaintiff
                                      MARY TAGLIAFERRI

**THIRD AMENDED COMPLAINT FOR DAMAGES; BREACH OF CONTRACT TO PAY A COVERED CLAIM; BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING; INTENTIONAL MISREPRESENTATION**